UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

-----------------------------------------------------------------X
KARL AHLERS,

        Plaintiff,

-against-

TODD A. GRYGO, et al.,

        Defendants.
-----------------------------------------------------------------X

MEMORANDUM
AND ORDER
02-CV-3256 (JG) (LB)

A P P E A R A N C E S:

    KARL AHLERS
        #56909-054
        Manhattan Psychiatric Center DB9
        Wards' Island Complex
        New York, NY 10035
        Plaintiff, *Pro Se*

    ANDREW M. CUOMO
        Attorney General for the
        State of New York
        120 Broadway, 24th Floor
        New York, NY 10271
    By:   Michael J. Keane, Assistant
        Attorney General
        Attorneys for Defendants

JOHN GLEESON, United States District Judge:

        Karl Ahlers, currently detained at the Manhattan Psychiatric Center in New York City, brings this *pro se* action alleging violations of his constitutional rights during his incarceration at the Arthur Kill Correctional Facility ("AKCF") on Staten Island. The defendants, which include both named and unidentified AKCF officers, move for summary judgment on Ahlers's claims. For the reasons stated below, defendants' motion is granted in part and denied in part, and the claim against the unidentified officers is dismissed.

BACKGROUND

In November 2001, Ahlers was incarcerated at AKCF. He alleges that during this time, he worked as a clerk in the AKCF law library and assisted inmate Daniel Smith in prosecuting a legal action against defendant Todd Grygo, a corrections officer at AKCF. Amended Compl. 3. Ahlers contends that when Grygo heard that he was assisting Smith, he made remarks such as "what goes around, comes around" and "payback is a bitch" in Ahlers's presence. *Id.* Ahlers's submissions do not indicate when Grygo made these statements.

On March 17, 2002, Grygo was assigned to Ahlers's housing area at AKCF. Grygo asked Ahlers if the two towels hanging on a divider in Ahlers's area were dry. Ahlers checked the towels, found that they were dry, and began to fold one of them. Grygo then began to remove other inmates' hanging towels and toss them on the respective inmates' lockers. Returning to Ahlers's area, Grygo removed the remaining towel and "threw it over the open door of [Ahlers's] locker." *Id.* at 4. Ahlers then told Grygo "I would appreciate it if you would keep your dirty hands off a towel that I use on my body," and Grygo replied "I told you to remove the towels." *Id.* (internal quotation marks omitted). Ahlers then stated that he was complying with Grygo's order, and Grygo accused Ahlers of "playing games" and told Alhers he would "take care of" him. *Id.* (internal quotation marks omitted).

Following this incident, Grygo wrote a misbehavior report accusing Ahlers of violating "inmate rule[s] of behavior" 106.10 (failure to obey a direct order) and 107.11 (harassment).[1] Amended Compl. 4, *see also* Ahlers Dep. 25. The disciplinary hearing for

---

[1] The record does not indicate the contents of these rules, but I assume that the parties are referring to the "Institutional Rules of Conduct" promulgated by the New York State Department of Correctional Services that govern "behavior in all correctional facilities." N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2.
Rule 106.10 provides that "[a]n inmate shall obey all orders of department personnel promptly and without argument." *Id.* at § 270.2(B)(7)(i).
Rule 107.11 provides that "[a]n inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee or any other person . . . ." *Id.* at § 270.2(B)(7)(ii).

2

Grygo's report was originally scheduled for March 25, 2002, and was finally held before Lieutenant Ferro on March 28. Ahlers alleges that Ferro repeatedly told him that "since [Ahlers] worked in the Law Library, he (Ferro) would 'make sure that [Ahlers] received due process.'" *Id.* at 5.

Ahlers alleges that he did not receive "an impartial hearing as required by Title VII, NYCRR, Section 253.1(b); NYS DOCS Directive 4932, Section 253.1(b)." *Id.* at 6. He claims that Ferro prevented him from asking Grygo "all the questions pertaining to the incident," that Ferro had "an off-the-record conversation with Grygo," and that "Grygo's examination" was conducted via a speakerphone, making it "extremely difficult" for Ahlers, who hearing is impaired, to understand Grygo's testimony." *Id.* Ahlers also contends that, during the hearing, "it was ascertained" that Grygo "had made a false entry concerning the incident in the housing unit log book." *Id.* at 5.

Following the hearing, Ferro found that Ahlers had violated rule 107.1 but had not violated rule 106.10. Ahlers Dep. 30-31. On the Disciplinary Hearing Disposition Sheet, Ferro listed Ahlers's "dirty hands" statement as the "Evidence Relied Upon." Amended Compl. at 7.[2] Under "Reasons For Disposition," he wrote, "Making harassing comments to a corrections officer performing his duties will not be tolerated in a correctional facility. This disposition will serve to deter future type [*sic*] misbehavior." *Id.* Ahlers was sentenced to seven days' confinement in the Special Housing Unit (SHU). Ahlers states that he immediately appealed Ferro's decision to the AKCF's superintendent, but he was taken "directly" to the SHU "without any of his property nor medications," and was denied use of prescription eye medication for "more than 24 hours" following his placement in the SHU. *Id.* at 8. He alleges that four

---

[2] It is not clear from Ahlers's complaint whether the "Evidence Relied Upon" statement was contained in the disposition sheet or some other writing created pursuant to the hearing.

unidentified corrections officers withheld his medication during this period, and only desisted "after intervention by the Inmate Grievance civilian supervisor at the time, Mr. Johnny Blue, on March 30, 2002." *Id.* at 12.

Ahlers also alleges that he was wrongfully deprived of property during this period. Corrections Officer Daland was responsible for packing and inventorying Ahlers's possessions and delivering them to the SHU. Ahlers alleges that other inmates saw Daland discarding some items during the packing, and that Daland filed a misbehavior report alleging that Ahlers possessed contraband, but these "charges" were ultimately dismissed. He alleges that another officer, DeSanto, went through his property while he was in the SHU, "but the inventory . . . that Daland had prepared was mysteriously missing, as well as items that were later ascertained to have been packed by Daland." *Id.* at 8.[3] The missing items included Ahlers's "complete legal and personal address file" and "all his pens and postage stamps." *Id.* Ahlers also indicates that he filed a "Facility Claim" relating to this missing property but did not receive a favorable resolution. Ahlers Dep. 56 ("I may have gotten a response where he denied everything and it was dismissed.").

On March 31, 2002, the Superintendent "modified" Ahlers's sentence, and Ahlers spent only three days and five hours in the SHU. Amended Compl. 9. Upon his release, however, he was not returned to the "Veteran's Dorm" where he had previously lived, even though beds were available there. Instead, he spent several months in less desirable housing before returning to his former dorm. *Id.* at 9.

On May 30, 2002, Ahlers filed a complaint alleging various civil rights violations arising from the aforementioned events. On July 2, 2003, after several months of motion

---

[3] Ahlers's complaint states that DeSantos "went through" his property on "March 30, 2003," Amended Compl. 8, but I assume he means 2002.

4

practice, Magistrate Judge Lois Bloom issued a Report and Recommendation (R&R) recommending that I dismiss all of the claims in the complaint with two exceptions: (1) the retaliation claim against Grygo and (2) the claim that certain defendants violated Ahlers's Eighth Amendment rights by withholding his medications. Judge Bloom also recommended that I grant Ahlers leave to amend his complaint to specify the officers personally involved in the Eighth Amendment violation. No objections were filed and, in an order dated July 22, 2003, I adopted Judge Bloom's R&R in its entirety, and dismissed Ahlers's complaint with leave to replead.

On August 5, 2003, Ahlers filed an amended complaint. On September 2, 2003, I granted defendants' request to enlarge the time to respond to September 30, 2003. Defendants did not file an answer until July 8, 2004. Judge Bloom scheduled a telephone conference for September 2004, but adjourned it after receiving a letter from Ahlers indicating that he had recently undergone surgery and had limited access to his legal papers. On October 21, 2004, Ahlers notified Judge Bloom that his health remained poor and he still had not obtained his legal papers from AKCF. He also requested that Judge Bloom appoint counsel to represent him. Judge Bloom denied this request on November 4, 2004, finding that Ahlers had failed to make a showing of merit sufficient to warrant the appointment of counsel.

On January 8, 2005, Ahlers wrote Judge Bloom to request assistance in obtaining certain documents relevant to his claim. On March 6, 2006, Judge Bloom issued an order denying this request as moot, noting that the parties, after Ahlers's request, had conducted discovery and motion practice.

Nearly two years after this order, Judge Bloom ordered Ahlers to show cause why his case should not be dismissed for failure to prosecute. In a letter dated December 2, 2007, Ahlers informed Judge Bloom that he was the subject of a civil commitment proceeding and was

presently confined in the Manhattan Psychiatric Center. On March 29, 2008, I directed Ahlers to inform the Court of the status of his commitment proceedings. On June 16, 2008, after a brief reply from Ahlers, I declined to continue to hold the case in abeyance, and set a schedule for pretrial motions. On December 23, 2008, defendants filed their motion for summary judgment. They attached three exhibits to their motion: a copy of Ahlers's amended complaint, the transcript of a December 8, 2008 deposition of Ahlers, and a declaration by defendant Grygo. On January 9, 2009, Ahlers filed a "Statement in Opposition to Defendants' Motion for Summary Judgment." Oral argument was scheduled for February 6, 2009. On February 5, 2009, I received a fax from the Legal Affairs Department of the Manhattan Psychiatric Center informing me that Ahlers would not be able to participate in the February 6 argument. Accordingly, I took the motion on submission.

DISCUSSION

A.  *Motion for Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994) ("[T]he burden is on the moving party to demonstrate that no genuine issue respecting any material fact exists." (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975))). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is proper when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo*, 22 F.3d at 1223-24 (citations omitted).

B.   *Construction of Ahlers's Complaint*

As the Second Circuit has frequently advised, the filings of pro se litigants should be construed "liberally" and read "to raise the strongest arguments they suggest." *Ferran v. Town of Nassau*, 471 F.3d 363 (2d Cir. 2006). Ahlers's complaint, after alleging the facts recited above, contends that "Grygo, in his individual capacity and under color of state law, maliciously and intentionally violated Plaintiff's constitutional right to be free from retaliation when he wrote [a] retaliatory misbehavior report against Plaintiff, then conspired with the supposedly impartial hearing officer, off the record, to find Plaintiff guilty of the charges embodied in the misbehavior rep[or]t, then conspired with Daland and De[Santos] to destroy Plaintiff's legal addresses, postage stamps and pens in an effort to deny him access to the courts." Amended Compl. at 11. He then states that, "[a]s a direct and proximate cause of the aforesaid acts, Grygo, Ferro, Daland

7

and DeSantos, acting in their individual capacity under color of New York State law, subjected plaintiff, and continue to subject Plaintiff to denial of rights guaranteed by the Fourth, Fifth, and [F]ourteenth Amendments to the Constitution of the United States." *Id.*

Construed liberally, Ahlers's complaint raises eight claims. First, he alleges individual retaliation claims against Grygo and Ferro. He also claims that Grygo conspired to retaliate with Ferro. Fourth, by claiming that he did not receive an impartial hearing, that Ferro prevented him from examining Grygo, and that the speakerphone connection prevented him from hearing Grygo's testimony, he argues that the disciplinary hearing did not comport with due process. Fifth, he claims that Grygo, Daland, and DeSantos conspired to deprive him of access to the courts. He also appears to allege that Daland and DeSantos individually deprived him of access to the courts. Finally, he claims that four unnamed defendants, by depriving him of his medication, subjected him to cruel and unusual punishment in violation of the Eighth Amendment. Accordingly, I will consider defendants' arguments as they bear on each of these claims. However, I must first address defendants' arguments that Ahlers failed to exhaust his administrative remedies and that the defendants are entitled to qualified immunity.

C. *Exhaustion of Administrative Remedies*

Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has clarified that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The

exhaustion requirements also apply to a plaintiff seeking relief not available in the prison administrative proceeding, such as monetary damages. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). The Supreme Court has recently held that the failure to exhaust under the PLRA is an "affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007).

Defendants' Memorandum of Law asserts that "[t]he record shows that plaintiff failed to exhaust." Def. Mem. 18. However, it does not cite to any portion of the record or otherwise explain this assertion, and the record suggests that Ahlers did exhaust available remedies. Ahlers's Statement in Opposition asserts that he was "familiar with facility rules and regulations" and "would not permit a corrections officer to openly admit to writing a (false) misbehavior report in retaliation for plaintiff carrying out his work detail, without questioning such action," Pl. Stmt. in Opp. ¶ 8, which I construe as an assertion that he took the necessary steps to challenge Grygo's actions while at AKCF. Furthermore, both his complaint and his deposition indicates that he appealed Ferro's disciplinary decision with some success, and that he filed a "Facility Claim" pertaining to his missing property. Amended Compl. 7-9, Ahlers Dep. 21, 31-32.[4] Because the defendants have failed to demonstrate any administrative steps Ahlers failed to take, they are not entitled to summary judgment based on the affirmative defense of a failure to exhaust.

D.   *Qualified Immunity*

"Qualified immunity shields police officers acting in their official capacity from

---

[4] Although Ahlers attests, under penalty of perjury, that the statements in both his complaint and his response to the summary judgment motion are true, neither document is notarized. Accordingly, they do not constitute, respectively, a verified complaint or an affidavit, and should not be considered in determining whether the record at this stage warrants summary judgment. While it is not clear that Ahlers's circumstances warrant a departure from this procedure, I find that the facts contained in Ahlers's deposition, which *is* a part of the record on this motion, do not differ materially from those alleged in Ahlers's complaint and responsive statement.

9

suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (internal quotation marks omitted). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that in deciding whether a suit against government officers is barred by qualified immunity, a court must first "determine whether the facts, taken in the light most favorable to the party asserting an injury, show a violation of a constitutional right" and then "determine whether the constitutional right was 'clearly established' such that '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Holeman*, 425 F.3d at 189 (quoting *Saucier*, 533 U.S. at 201-06) (alterations in original). However, the Supreme Court recently held in *Pearson v. Callahan*, 555 U.S. ___, No. 07-751, 2009 WL 128768, at *3 (Jan. 21, 2009), that "the *Saucier* procedure should not be regarded as an inflexible requirement" and concluded that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Id*. at *3, *9-10.

In asserting qualified immunity, defendants argue that Ahlers "has no right against a misbehavior report if he admits he obeyed a direct order and argued (or harassed) [*sic*] a corrections officer," and that "plaintiff has no right against the confiscation of contraband." Def. Mem. 15. These arguments miss the mark. Ahlers has a constitutional right to be free from discipline imposed in retaliation for engaging in protected activity, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274 (1977), and he does not admit that he violated any disciplinary rules. Furthermore, Ahlers has a right to be free from "deliberate and malicious" interference with his property that hinders his "efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). In this case, the actions taken by the defendants are undisputed, and it is their

motivation and effect that will determine whether they violated Ahlers's rights. I must view the facts in the light most favorable to Ahlers, and, in this light, they show the violation of constitutional rights.

Similarly, if the defendants acted with the intent alleged by Ahlers, a reasonable officer would understand that he was acting unlawfully. According to defendants, even if I conclude (as I do) that binding precedent clearly establishes the rights asserted by Ahlers, "it would be reasonable for these defendants to believe that no such precedent existed and their actions were therefore reasonable under the circumstances." Def. Mem. 16. This is not so; the Second Circuit has long held that "[p]rison officials are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Defendants properly observe that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Def. Mem. 17 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). However, if Ahlers is to be believed, defendants fall into the latter category. Accordingly, they cannot at this stage avail themselves of the protection of qualified immunity.

E. *The Individual Retaliation Claim Against Grygo*

> In *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L.Ed.2d 471(1977), the Supreme Court established the standard for a § 1983 claim that the state actor retaliated against a plaintiff for exercising a constitutional right. The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. *Id.* If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." *Id.* Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Generally, "retaliation" refers to an "adverse action" that has a "causal connection" to "protected activity." *See Dawes v. Walker*,

11

239 F.3d 489, 492 (2d. Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.*

Defendants twice assert that "at least one, or several elements of retaliation claims are not satisfied." Def. Mem. 10, 12. Specifically, they argue that there was no causal connection between Grygo's filing and prosecution of the misbehavior report and Ahlers's protected activity, and that Grygo would have taken the same actions absent any protected activity by Ahlers. Accordingly, I must decide whether there is a genuine issue of material fact as to whether (1) Ahlers's protected activity was "a substantial or motivating factor" behind Grygo's actions or (2) Grygo would have taken these actions even in the absence of the protected conduct.

    1.    *Substantial or Motivating Factor*

To determine whether a causal connection exists between protected activity and adverse action, courts consider such factors as "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

As to temporal proximity, defendants argue that "a full seven months" passed between Ahlers's assistance of Smith and Grygo's report based on the towel incident, and argue that this lapse is too great to support the inference that the former is causally connected to the latter. However, Ahlers alleges that he assisted Smith during November 2001 and that the towel

incident occurred in mid-March 2002, which suggests a three-to-four-month lapse between the events. Ahlers Dep. 62. Although the defendants might establish a longer lapse at trial, I am obliged to credit the evidence of the non-movant in deciding a motion for summary judgment. Because the Second Circuit has expressly held, in the context of employment retaliation, that a period of four months provides "temporal proximity . . . sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion," *Gorman-Bakos v. Cornell Coop. Extenstion of Schenectady County*, 252 F.3d 545, 555 (2d Cir 2001), I conclude that the timing of Grygo's action provides some support for Ahlers's retaliation claim.

Although this temporal proximity might be less probative in a prisoner retaliation case, which I am instructed to view "with skepticism and particular care," *Dawes*, 239 F.3d 492, it is not Ahlers's only evidence of retaliatory intent. Grygo's statements concerning his motivation are obviously relevant to this issue, and Ahlers contends that when Grygo heard that he was assisting Smith, he made remarks such as "what goes around, comes around" and "payback is a bitch" to Ahlers. Amended Compl. 3, Ahlers Dep. 61.[5] Although these comments are ambiguous, and Grygo denies having made them, Grygo Decl. 3, I must assume for summary judgment purposes that they were made, and I find it would be reasonable to infer from them that Grygo was threatening retribution for Ahlers's assistance of Smith. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("disparity between the affidavits of [prisoner and corrections officer] itself creates a credibility issue that is not readily amenable to resolution on summary judgment").

The "vindication" and "good behavior" factors listed in *Baskerville*, 224 F. Supp.

---

[5] Ahlers's deposition does not explicitly mention the "payback" statement. However, even if it is proper to consider only Ahlers's deposition at the summary judgment stage, *see supra* note 4, that deposition also alleges that Grygo made "very pointed comments" regarding Ahlers's assistance "at different times." Ahlers Dep. 29. I also note that Grygo's declaration, in which he denies making such statements, does not appear to be

13

2d at 732, also provide some evidence of retaliatory motive. Ahlers was vindicated at the hearing as to the disobedience charge, and his punishment on the harassment charge was reduced on appeal, Ahlers Dep. 30-32, an outcome probative of retaliatory intent. And while there is little evidence in the record as to Ahlers's prior good behavior, the fact that he was assigned to work as a clerk in the law library, Ahlers Dep. 16, suggests that he was not an incorrigible violator of prison rules and regulations.

As to the defendant's own statements concerning his motivations, Grygo has submitted a declaration asserting that he only issued the misbehavior report because it was warranted by Ahlers's conduct. Grygo Decl. 2. However, this statement is rebutted by Ahlers's deposition testimony that Grygo was the target of "more complaints" from inmates "than any other officer in the facility." Ahlers Dep. 16. Accordingly, relying on the factors identified by defendants, I conclude that Ahlers has adduced sufficient evidence to create a genuine issue of material fact on the issue of retaliatory intent.

2. *Legitimate Basis for Adverse Action*

Given the foregoing analysis, the defendants are not entitled to summary judgment unless they can establish, as a matter of law, that Grygo would have filed the misbehavior report "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287. In *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994), the Second Circuit held that a retaliation defendant satisfies this burden when it is "undisputed that [plaintiff] had in fact committed the prohibited conduct."

*Lowrance* does not govern this case, however, because here Ahlers vigorously disputes that he committed prohibited conduct. While the actions he took and the statements he made are not in dispute, Ahlers has consistently denied that this conduct was prohibited -- *i.e.,*

---

notarized.

that it constituted disobedience or harassment. As to the disobedience charge, he maintains that he complied with (or was in the process of complying with) Grygo's order to remove the towels, and it appears that Lt. Ferro agreed with this argument at the hearing. As to the harassment charge, while Grygo admits that he made the "dirty hands" comment, he argues that he was merely voicing a legitimate hygienic concern, and that the comment did not constitute harassment. Thus, unlike *Lowrance*, this is not a case where it is undisputed that a prisoner alleging retaliation has engaged in prohibited conduct. 20 F.3d at 535.[6]

Accordingly, the burden is on the defendants to show that Grygo's adverse action "would in any event have been taken on the constitutionally valid basis." *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984). The record demonstrates that in this case, "that issue of hypothetical causation requires fact-finding." *Id.* The harassment rule covers a broad range of conduct, *see supra* note 1, and it is reasonable to infer that it is, as a matter of practical necessity, selectively enforced. It seems reasonable to assume, as the Second Circuit apparently did in *Sher*, that prison officials will always transfer or otherwise isolate a prisoner if they believe that his presence in the general population "pose[s] a substantial threat to his security and that of the prison." 739 F.2d at 82; *see also Davidson v. Kelly*, 1997 WL 738109 at *3 (2d Cir. 1997) (summary order) (in case where plaintiff alleged that placement in medical keeplock was improper retaliation, summary judgment for defendant was appropriate, even assuming a retaliatory motive, when plaintiff did not dispute that he refused to take a TB test and prison policy was to place "every" inmate who refused a TB test into medical keeplock).

---

[6] One might argue that the proper inquiry under *Lowrance* is not whether the existence of prohibited conduct is (factually) disputed, but whether its existence is (legally) disputable. Interpreted this way, *Lowrance* requires me to ask not whether Ahlers actually disputes that he violated the rules, but whether I can say, as a matter of law, that he *did* violate the rules. Because defendants do not raise this argument, I read *Lowrance* literally, and distinguish it accordingly. In any event, it seems clear that the purpose of the rule of *Lowrance* is to efficiently dispatch claims where a plaintiff's wrongdoing is undisputed, and not to convert a motion for summary judgment on a retaliation claim into a summary judgment action on a plaintiff's alleged disciplinary violation.

It is less realistic to assume, as defendants ask me to do here, that a corrections officer (or this particular corrections officer) will file a report every time an inmate makes a statement that arguably falls within the ambit of the harassment rule. Grygo avers that he only files a misbehavior report when it is warranted, Grygo Decl. ¶ 6, but that does not mean he would file a report each and every time it is warranted. And Ahlers suggested in his deposition that some corrections officers file reports daily, while others might go years without filing one. Ahlers Dep. 63-64. Although the evidence of retaliatory motivation is far from overwhelming, Grygo has failed to demonstrate, as a matter of law, that his "challenged action would have been taken on the valid basis alone." *Id.*

E. *Individual Retaliation Claim Against Ferro*

Applying the same framework described above, I conclude that Ahlers has failed to present a triable issue of fact regarding any alleged retaliation by Ferro. His evidence against Grygo barely suffices to withstand summary judgment, and the evidence against Ferro is even less compelling. While Grygo allegedly made veiled threats regarding the assistance Ahlers provided to Smith, Ferro said only that he would make sure Ahlers received due process. One could reasonably infer from this statement that Ferro might have conducted the hearing of a less sophisticated inmate with less care, but it does not suggest that Ferro was aiming to punish Ahlers for assisting other inmates. Furthermore, Ferro actually found that Ahlers was not guilty of the disobedience charge, which also suggests that a desire to retaliate was not a substantial or motivating factor in the actions he took at the hearing. Thus, to the extent Ahlers alleges that Ferro retaliated against him, his claim does not survive summary judgment.

F. *Procedural Due Process Claim*

> The due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Wolff v.*

> *McDonnell*, 418 U.S. at 556, 94 S. Ct. 2963. Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See id.* at 567-70, 94 S. Ct. 2963. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004).

Given these standards, the alleged defects in Ahlers's disciplinary hearing before Ferro do not constitute a due process violation. Because Ahlers had no right to cross-examine Grygo, it was not improper for Ferro to prevent him from doing so or to order him to "sit outside" while Ferro spoke with Grygo. Ahlers Dep. 65. For the same reason, Ahlers's alternate version of events, in which a faulty speakerphone prevented him from hearing Grygo's testimony, also does not offend the Due Process Clause.

Finally, as a matter of law, the fact that Ferro and Grygo were roommates, Ahlers Dep. 33, without more, did not render Ferro unconstitutionally impartial. The Second Circuit has recognized "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally," and that "it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Although Ferro may have been "less than a perfectly neutral arbiter," Ahlers cannot demonstrate that he had "*no* chance to prevail at the hearing," *id.*; indeed, he did prevail on the disobedience charge. Thus, to the extent that Ahlers's complaint can be liberally construed to raise a procedural due process claim, the defendants are entitled to judgment as a matter of law on that claim.

G. *Ahlers's Conspiracy Claims*

Ahlers also alleges that Grygo conspired with both Ferro and with DeSantos and

17

Daland to deprive him of various rights. It is axiomatic that to prevail on a conspiracy claim, a plaintiff must demonstrate a conspiracy. "Although a conspiracy need not be shown by proof of an explicit agreement, a plaintiff must demonstrate at least that parties have a tacit understanding to carry out the prohibited conduct." *Cine Sk8, Inc.*, *v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007). Ahlers has failed to make such a showing with regard to the conspiracies alleged.

*Cine Sk8* provides an illuminating comparison. In that case, a town board amended plaintiff's special use permit to bar it from holding teen dances at its recreation center. Plaintiff alleged both that the individual members of the town board acted with racial animus in amending the permit, and that the board collectively conspired to do so. The sole evidence of a conspiracy was a letter from the town supervisor to the plaintiffs stating that there was a "strong consensus" among the town board members that the teen dances should stop. *Id.* at 792. The Second Circuit held that, even though there was sufficient evidence for a reasonable jury to find that a majority of the town board members, as individuals, were motivated by racial animus, it could not "draw a reasonable inference from this evidence alone that the members . . . had even a tacit understanding" to amend the permit because of racial animus. *Id.*

In this case, the evidence of agreement is even weaker. The only evidence suggesting a conspiracy between Grygo and Ferro was that they lived together and discussed the case outside of Ahlers's presence. Although they likely discussed Grygo's report against Ahlers, there is no indication that they reached any consensus as to how it should be resolved. Thus, while Grygo himself may have had a retaliatory motive, and he may have conferred about the proper course of action with Ferro, *Cine Sk8* demonstrates that these two facts are insufficient to create a triable issue of fact as to the existence of a conspiracy to rule against Ahlers in retaliation for his protected conduct. As to any possible conspiracy between DeSantos, Daland,

and Grygo, Ahlers points to no evidence to support the existence of an agreement between those parties, and I can find none. Accordingly, to the extent Ahlers alleges that any of the defendants conspired to violate his rights, the defendants are entitled to summary judgment on such claims.

H. *Denial of Access to the Courts*

Ahlers also claims that Daland's and DeSantos's handling of his property operated to deny him access to the courts. However, such a claim is "insufficient" absent a showing that defendants' actions "caused him to miss court deadlines or in any way prejudiced his legal actions. Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

By Ahlers's own admission, he has not identified any proceeding in which the loss of his property caused demonstrable prejudice. He contends, however, that he is prevented from making this demonstration because "he does not have access to the bulk of his files and documents." Pl. Response ¶ 11. This argument is unavailing, as it has been over six years since Ahlers filed his complaint, and he has had access to the tools of discovery in order to acquire information to support his claim. DeSantos and Daland are entitled to summary judgment on Ahlers's claims against them.

I. *Claims Against Unidentified Defendants*

Over five years ago, I dismissed Ahlers's claim against the unidentified defendants and gave him leave to file an amended complaint indentifying these defendants within thirty days. Because he has failed to do so, his claim against the "John Doe" defendants is dismissed. *Hindes v. FDIC*, 137 F.3d 148, 155 (3d Cir. 1998) ("The case law is clear that fictitious parties must eventually be dismissed, if discovery yields no identities." (internal

quotation marks and alterations omitted)).

## CONCLUSION

For the foregoing reasons, the complaint against the unidentified defendants is dismissed. The motion for summary judgment is denied as to the retaliation claim against Grygo and granted in all other respects. Jury selection and trial will occur on May 11, 2009 at 9:30 A.M. Counsel for Grygo is directed to take the steps necessary to assure that Ahlers is produced in court for the trial. Although Ahlers's complaint demands a jury trial, I believe that a bench trial is in the best interests of both parties. Accordingly, the parties are directed to inform the Court by April 3, 2009 whether they wish to try this case to a jury.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 13, 2009
       Brooklyn, New York