UNITED STATES DISTRICT COURT     ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

KARL AHLERS,

    *Plaintiff*,           FINDINGS OF FACT
 -against-               AND CONCLUSIONS
                     OF LAW
                     02-CV-3256 (JG) (LB)

TODD A. GRYGO,

    *Defendant*.
---------------------------------------------------------------X
A P P E A R A N C E S:

  KRAMER LEVIN NAFTALIS & FRANKEL LLP
    1177 Avenue of the Americas
    New York, New York 10036
 By: Robin Wilcox
    Jennifer Diana
    Attorneys for Plaintiff

  ANDREW M. CUOMO
    Attorney General for the State of New York
    120 Broadway, 24th Floor
    New York, New York 10271
 By: Michael J. Keane
    Andrew Meier
    Attorney for Defendant

JOHN GLEESON, United States District Judge:

    On May 30, 2002, plaintiff Karl Ahlers brought a *pro se* action alleging violations of his constitutional rights during his incarceration at the Arthur Kill Correctional Facility ("AKCF") on Staten Island. The suit, as originally filed, was against several defendants, including named and unnamed AKCF officers. On July 22, 2003, on the defendant's motion to dismiss, I ordered all claims dismissed except the retaliation claim against defendant Todd A. Grygo and the claim that "certain defendants" violated Ahlers's Eighth Amendment rights by denying him his eye medication for over 24 hours. In addition, Ahlers was afforded thirty days

to file an amended complaint, which he did on August 5, 2003. On January 23, 2009,[1] defendants filed a motion for summary judgment. On March 13, 2009, I granted the motion as to all unidentified defendants and as to all claims except Ahlers's retaliation claim against Grygo.

After appointing counsel to represent Ahlers at trial,[2] a bench trial was held on that claim on July 23, 2009. Thereafter, the parties submitted proposed findings of fact and conclusions of law and returned to court for summations. I now make the following findings of fact and conclusions of law.

I.  *Findings of Fact*

   A.  *The Parties and Ahlers's Dormitory at AKCF*

Ahlers, a 76-year-old veteran, was incarcerated by the New York State Department of Corrections from 1982 until 2005. From October 1999 until August 2004, he was an inmate at AKCF, a medium security prison.

Grygo is a New York State Department of Corrections Officer. He worked at AKCF beginning in 1995, and was there until November 2004. In 2001 and 2002, Grygo was assigned to Rotating Days Off Relief ("RDO Relief"), which meant that he covered for other officers who were assigned to Units G-1, D-1 (the "Veteran's Dorm"), and B-Control when they had days off.

While at AKCF, Ahlers lived in the Veteran's Dorm. The dormitories at AKCF consist of roughly 50 cubicles. Each cubicle is formed by four-foot high walls and contains a bed and locker. One inmate is assigned to each cubicle, with the exception of ten cubicles,

---

[1] The case, one of more than half a dozen lawsuits Ahlers has filed in this court, had a tortuous path between the motion to dismiss and the motion for summary judgment. Physical and mental problems, prison transfers and civil custody proceedings (Ahlers is a convicted sex offender), among other things, impeded the progress of the case. *See, e.g.,* doc entries 46 (seeking court intervention to retrieve files after transfer); 50 (ordering plaintiff to show cause why cause should not be dismissed for failure to prosecute); 51 (plaintiff's request for a stay due to pendency of civil confinement proceedings).

[2] The Court is immensely grateful to the firm of Kramer Levin Naftalis & Frankel LLP for its agreement to represent Ahlers *pro bono*.

which have bunk beds and house two inmates each. The Veteran's Dorm at AKCF housed veterans, had an American Legion Post, and was kept clean and in good repair. The Veteran's Dorm was considered by the inmates to be preferable to other units in the facility. Ahlers occupied one of the single cubicles in the dorm, not one of the ten doubles.

Ahlers worked as a law clerk in the AKCF law library. Law clerks assist inmates with legal problems and court submissions. Such assistance can include discussing how to proceed in a specific case, directing an inmate to reference materials, letter writing, and typing up legal papers and submissions. Ahlers was known within the facility as someone who would assist other inmates in the law library. In fact, Ahlers avoided much of the harassment and physical violence that sex offenders typically receive from other inmates because of his reputation as a helpful legal assistant to other inmates.

B.  *The Daniel Smith Lawsuit*

Daniel Smith was an inmate at AKCF in 2001 and was housed in the Veteran's Dorm. On November 8, 2001, he filed a complaint in federal court against Grygo, alleging assault and conspiracy to file a false misbehavior report. This was the first time Grygo had ever been sued. He was served with the complaint on January 2, 2002. The incident that gave rise to the Smith lawsuit (which involved a fan falling off the wall beside Grygo's desk and landing on Smith's head) occurred in the Veteran's Dorm, and Ahlers was present. After the incident, Smith approached Ahlers and asked for assistance. Ahlers helped Smith prepare and file a grievance against Grygo in the institution. He later helped Smith prepare his federal complaint.

Some time before March 17, 2002, but after the Smith complaint had been filed and served on Grygo, Grygo said to Ahlers, "Payback's a bitch," and "What goes around

3

[comes] around." Tr. 38-40.³ These statements were threats of retaliation for the assistance Ahlers had provided to Smith.

    C.    *The Towel Incident*

On March 17, 2002, less than three months after Grygo was served with Smith's federal complaint, Grygo was assigned to work in the Veteran's Dorm. When he came on duty, he began to remove towels that inmates had left hanging over their cubicle dividers. After removing them, Grygo was throwing the towels into the inmates' cubicles. Though there was a rule prohibiting the hanging of towels on cubicle walls, it was a common practice and the corrections officers, including Grygo, did not enforce the rule rigidly or consistently.

Ahlers saw Grygo removing other inmates' towels from their cubicle walls. As Grygo approached Ahlers's cubicle, Ahlers began to fold one of the two towels he had placed on his cubicle wall to dry. The other towel was still on the wall when Grygo reached Ahlers's cubicle. Grygo said something to Ahlers, but Ahlers, who has impaired hearing and wears a hearing aid, did not hear him. Grygo then took the other towel off the divider and tossed it into Ahlers's cubicle. Ahlers then said to Grygo, in substance, "I'd appreciate it if you wouldn't handle my towel that I use on my body with your dirty hands." Tr. 37. He made the statement politely so as to avoid problems with Grygo. His motivating concern was that Grygo had been handling other inmates' towels, and since AKCF is a medical facility, Grygo's hands could have carried germs.

Grygo responded by issuing Ahlers a misbehavior report. He charged Ahlers with failure to obey a direct order and harassment. In the misbehavior report, Grygo described the incident as follows:

> On the above time and date, as I (C.O. GRYGO) was making the first round of

---

³ Citations preceded by "Tr." are to pages of the trial transcript.

4

> the day, I noticed a dry towel hanging on a cube divider wall (cube #21), hanging into the aisle of unit D-1's dorm area. At the time, I ordered inmate AHLERS to remove the towel. Inmate AHLERS just stood in place, staring at myself (C.O. GRYGO) and saying nothing (VIO #106.10). At that time I noticed inmate AHLERS was wearing his hearing aides.
>
> When inmate AHLERS did not remove the towel, I (C.O. GRYGO) went to fold and confiscate said towel. Inmate AHLERS reacted, saying "get your dirty hands off my towel" (VIO #107.11) and began folding towels in cube #21. At that time I handed the towel to inmate AHLERS and asked him why he refused my direct order to remove the towel and notify him I was aware of his hearing aides being in his ears, inmate AHLERS answers "are you blind, I'm folding towels" (VIO #107.11)*, inmate AHLERS was folding towels in cube #21 after his first statement, but did not attempt to remove the forementioned towel on the cube divider before his second statement.

Pl's Exh. 5. In fact, Ahlers never said "get your dirty hands off my towel," or "are you blind, I'm folding towels."

After a misbehavior report is written, it is reviewed by a lieutenant, who classifies it as a Tier 1, Tier 2 or Tier 3 misbehavior report. A Tier 1 report is the least severe, and a Tier 3 is the most serious. The misbehavior report Grygo wrote against Ahlers was designated as a Tier 2 report. Lieutenant James Ferro conducted a hearing with respect to Grygo's allegations. After the hearing, Ferro dismissed the charge that Ahlers had failed to obey a direct order for lack of substantial evidence. Ferro upheld the harassment charge and sentenced Ahlers to seven days in "keeplock"[4] but his sentence was overturned -- an event that rarely occurs -- by AKCF's Superintendent.

Ahlers spent three days in keeplock before the sentence was overturned. During that time, Ahlers did not receive his eye medication, which had recently been prescribed after emergency eye surgery. Upon release from keeplock, Ahlers discovered that his legal papers, postage stamps, and addresses had been confiscated and destroyed. Ahlers also lost his bunk in

---

[4] "Keeplock" confinement generally means that an inmate is confined to his or her cell. This differs from confinement in a Special Housing Unit ("SHU"), which is a special cell. At a medium security prison like AKCF, however, where there are dormitories and not cells, a keeplock sentence is served in a SHU cell.

the Veteran's Dorm; it took him months to get his bunk there back.

D. *The Notary Incident*

Ahlers filed this action against Grygo on May 30, 2002. Grygo was served with the summons and complaint on June 25, 2002. Three weeks later, on July 15, 2002, Ahlers received a pass from Grygo to go to the notary, which is located in the administration building. Ahlers testified that on his way there, he saw that he would have to pass Officer Porter, who was on duty in the main corridor. Officer Porter distinguishes himself at AKCF by being something of a stickler on a seemingly random topic: when he is on duty, he requires inmates to wear their state-issued boots when passing through the main corridor. Ahlers, who was wearing sneakers, knew he'd be in trouble with Porter if he continued to the notary, so before reaching the main corridor, he returned to his dorm to get his boots.

Grygo, however, refused to let Ahlers into the dorm to get his boots. The reason: Ahlers did not have a pass to return to the dorm. Grygo mocked Ahlers's hearing problem by writing a note on a piece of paper asking whether Ahlers could read the note and instructing him to answer "yes or no." Tr. 53-54. Ahlers, who was increasingly uncomfortable with the situation, told Grygo that he would go to the notary on a different day. Grygo then ordered Ahlers to get his boots. When Ahlers asked about the order Grygo had just issued -- prohibiting Ahlers from getting his boots -- Grygo said he was rescinding the order and was now ordering Ahlers to get his boots. Ahlers finally got his boots and went to the notary, but a few days later Grygo wrote a misbehavior report accusing Ahlers of lying. Ultimately, the report was dismissed after a hearing.[5]

---

[5] Grygo testified that Ahlers had told Grygo that Porter had ordered Ahlers to return to the dorm and get his boots. Despite knowing that Porter always required inmates to wear their boots, Grygo claims he nevertheless called Porter to confirm whether he had in fact issued this order, and Porter said he had not seen Ahlers.

E. *Corrections Officers' Discretion In Handling Minor Infractions*

Misbehavior reports have serious consequences. If upheld, the inmate can be sentenced to time in keeplock or the SHU, lose privileges, be transferred to a different correctional facility and even have his prospects for parole jeopardized. As a result, misbehavior reports are taken seriously by inmates and by corrections officers. Corrections officers at AKCF do not write up inmates whenever they can. They are called upon to exercise discretion.

New York's Codes, Rules, and Regulations, Title 7, Ch. 5 § 250.2, entitled "General policies on discipline of inmates," states, in part:

> Just as the sentencing of inmates by courts, and techniques used for correctional treatment, must be appropriately varied to fit a complex matrix of individual circumstances and individual conditions, the disciplinary techniques within a correctional facility must be appropriately varied to fit such factors as:
> (1) the particular circumstances involved;
> (2) the overall behavior of the inmate; and
> (3) the problems in and the present atmosphere of the facility.
> Consequently, persons vested with responsibility for disciplinary measures in facilities of the department should not establish rigid structures for disciplinary sanctions, but should consider each situation individually.

§ 250(b). Similarly, New York State's Codes, Rules, and Regulations, Title 7, Ch. 5 § 251-1.5(a), entitled "Minor infractions," states:

> An employee should deal with minor infractions, or other violations of rules and policies governing inmate behavior, that do not involve danger to life, health, security or property by counseling, warning, and/or reprimanding the inmate, and the employee need not report such minor incidents.

Grygo was aware of these policies regarding the discipline of inmates for minor infractions.

---

After letting Ahlers into the dorm to get his boots without a pass, Grygo issued Ahlers a misbehavior report for lying about whether the boot-preferring Porter had in fact ordered him to return to his unit.

I do not credit Grygo's testimony. I find instead that he saw in the July 14, 2002 events an opportunity to pay back Ahlers for suing him in this case, and he seized that opportunity.

7

II.     *Conclusions of Law*

To prove a retaliation claim under 42 U.S.C. § 1983, a plaintiff must first show that he engaged in constitutionally protected conduct. *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir. 1998). Reporting the wrongdoing of corrections officers and other prison officials, and providing legal assistance to others who report such wrongdoing, qualifies as protected speech under the First Amendment. *See* Report and Recommendation (Docket No. 36)[6] (citing *Auleta v. LaFrance,* 233 F. Supp. 2d 396 (N.D.N.Y. 2002)); *Shaw v. Murphy*, 532 U.S. 223, 228 (2001); *Turner v. Safley,* 482 U.S. 78 (1987)(inmates have a First Amendment right to communicate legal advice); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)(inmates have constitutional right of access to courts and to petition government for redress of grievances).

As a law clerk, Ahlers regularly provided various forms of legal assistance to inmates. Ahlers specifically assisted Daniel Smith with drafting and preparing the grievance and federal complaint that Smith filed against Grygo. This conduct was protected under the First Amendment.

Ahlers must prove by a preponderance of the evidence that the protected conduct was "a substantial or motivating factor" in Grygo's decision to discipline him. *Hynes,* 143 F.3d at 657. Courts consider four types of evidence as suggestive of an improper motive

> (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation [for disciplining the plaintiff.]

*Baskersville v. Blot,* 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002)(citing *Colon,* 58 F.3d at 872-73); *see Nicholas v. Tucker,* 89 F. Supp. 2d 475 (S.D.N.Y. 2000). Where circumstantial evidence is "sufficiently compelling," direct evidence is not required. *Bennett v. Goord,* 343 F.3d 133, 139

---

[6]     I adopted the Order and Recommendation on July 22, 2003. (Docket No. 37).

8

(2d Cir. 2003)(rejecting defendant's argument that inmate needed to produce direct evidence of officers' actual knowledge of a legal settlement that inmate claimed was the impetus for retaliation).

Ahlers alleges that Grygo filed the March 17, 2002 misbehavior report to retaliate against Ahlers for assisting Smith in suing Grygo. Grygo testified that he did not know that Ahlers had assisted Smith with the lawsuit, and therefore he did not file the misbehavior report in retaliation for Ahlers's assistance. As suggested above, I find neither of Grygo's assertions credible.

The Smith lawsuit was, by *pro se* standards, a sophisticated document. Smith was not capable of preparing such a document on his own, and Grygo knew that. He also knew that Ahlers was the obvious person Smith would have turned to for assistance. As Grygo knew, Ahlers worked in the law library, was knowledgeable about the law and assisted other inmates with legal issues. The Smith complaint was typed, not handwritten, and Grygo knew that Ahlers had access to a typewriter and made frequent use of it. Grygo knew of no other law clerks in the Veteran's Dorm during the relevant time period.

I find that on March 17, 2002, Ahlers did not fail to follow a direct order. I further find that he acted respectfully towards Grygo. When Ahlers saw that Grygo was enforcing the towel rule, he simply began folding his own towels. He did not commit the infractions set forth in the March 17, 2002 misbehavior report. Grygo issued the misbehavior report for a retaliatory purpose only.

Ahlers did not harass Grygo. When he asked Grygo not to handle his towel, he spoke calmly and politely. He was trying to stay *out* of trouble, not cause it. He made the statement out of a legitimate concern for his health and hygiene. Inmates suffering from

9

communicable diseases could be housed in the dorm, and Ahlers had just watched Grygo handle other inmates' used towels. Ahlers never said "Get your dirty hands off my towel" or "Are you blind, I'm folding towels," as Grygo stated in the misbehavior report. No reasonable person could construe Ahlers's words as harassing.

Grygo was served with the Smith lawsuit on January 2, 2002 -- two and one-half months before the March 17, 2002 towel event. Grygo made threatening comments to Ahlers after he was served with the Smith complaint and before March 17, 2002. He carried through on those threats by filing the bogus misbehavior report on March 17, 2002.

Ahlers filed this lawsuit alleging retaliation on May 30, 2002, and Grygo was served with the complaint on June 25, 2002. Just three weeks later, on July 15, 2002, Grygo issued Ahlers yet another bogus misbehavior report. The ostensible reason for the misbehavior report, *i.e.,* Ahlers allegedly lied about whether Porter had ordered him to go back to his dorm, was pretextual. The real reason, I find, was to punish Ahlers for suing him.

The evidence makes clear, and I find, that Grygo does not like being sued by inmates; that when the Smith and Ahlers lawsuits were filed, he retaliated by issuing unnecessary misbehavior reports. Ahlers has carried his burden of proving that retaliation was Grygo's sole motivating factor for issuing the misbehavior report on March 17, 2002.

To constitute an adverse action for the purposes of a retaliation claim, the defendant's conduct has to be the kind that "would deter a similarly situated individual of ordinary firmness" from complaining of mistreatment. *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001). Conduct that would not have such a deterrent effect is "*de minimis* and therefore outside the ambit of constitutional protection." *Id.* The test is an objective one and does not depend on whether the plaintiff himself was in fact deterred from continuing to file grievances.

*Gill v. Pidlypchak,* 389 F.3d 379, 383-84 (2d Cir. 2004). Misbehavior reports can have serious, long-term consequences for inmates, and courts have found that filing a false misbehavior indeed constitutes an adverse action for purposes of a § 1983 claim. *Jones,* 45 F.3d at 679-80 ("At the doctrinal level, we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances."). The average inmate does not want to receive misbehavior reports, and it follows that the average inmate would be intimidated by the threat of receiving a false one. Grygo's actions in this case would certainly deter a similarly situated inmate of ordinary firmness from exercising his or her constitutional rights.

As for damages, I find that Ahlers is entitled to an award of compensatory damages in the amount of $2,000 for the harm associated with (a) having to defend a false misbehavior report; (b) spending three days in keeplock; (c) being deprived of prescription eye medication during his time in keeplock; (d) losing his legal papers, correspondence, addresses and postage stamps; and (e) being transferred out of the Veteran's Dorm. Ahlers is also entitled to punitive damages in the amount of $3,000, which are necessary to deter Grygo as well as other corrections officers from engaging in retaliatory conduct against inmates for exercising their constitutional rights.

## CONCLUSION

The Clerk of the Court is directed to enter judgment in favor of the plaintiff, and against the defendant Grygo, in the amount of $5,000, and to close the case.

So Ordered.

John Gleeson, U.S.D.J.

Date: October 27, 2009
Brooklyn, New York